# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Brian K. Adams and**
**Traci R. Martens,**

        **Plaintiffs,**

**v.**                            **Case No. 08-2643-JWL**

**Entercom Kansas City, LLC,**

        **Defendant.**

## MEMORANDUM AND ORDER

Plaintiffs Brian K. Adams and Traci R. Martens filed suit against their former employer, Entercom Kansas City, LLC, alleging various claims arising out of the termination of their employment with Entercom. This matter comes before the court on Entercom's motion for summary judgment (doc. 44). Because plaintiffs conceded several claims in response to Entercom's motion for summary judgment,[1] the court is left to resolve Entercom's motion only as to plaintiffs' retaliation claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.; Ms. Martens' interference claim under the Family and Medical Leave Act, 29 U.S.C. § 2615(a); and Mr. Adams' state law breach of contract claim. As will be explained, the motion is granted.

---

[1]Specifically, plaintiffs concede the following claims, rendering summary judgment in favor of Entercom appropriate on these claims: plaintiffs' discrimination claims under the ADEA and the Kansas Age Discrimination in Employment Act, K.S.A. § 44-1111 et seq.; Ms. Martens' discrimination claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; and Mr. Adams' claim for breach of the collective bargaining agreement.

## I.    Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiffs, the nonmoving parties.   Defendant Entercom Kansas City, LLC owns and operates eight radio stations broadcasting in the Kansas City area.  This litigation concerns one of those stations–a classic rock station known as 99.7-KY, located at FM frequency 99.7 with FCC call letters KYYS.  Entercom created 99.7-KY in 1997.  For more than 20 years prior to that time, the KYYS call letters were associated with an album rock station (later considered "classic" rock) known as KY 102 and found at FM frequency 102.1.  In 1997, the company that owned KY 102 changed (or "flipped") the format of the station from a classic rock format to a modern adult contemporary format and, in doing so, abandoned the KYYS call letters and terminated the employment of the KY 102 on-air personalities, including plaintiff Brian K. Adams.  Attempting to capitalize on the format flip of KY 102, Entercom "recreated" the original KY 102 station as 99.7-KY, utilizing the KYYS call letters, maintaining the same classic rock format as the old KY 102, and hiring several on-air personalities from KY 102, including Mr. Adams, who was hired in May 1998.  Entercom hired plaintiff Traci R. Martens as an on-air personality for 99.7-KY in September 2005.  Unlike Mr. Adams, Ms. Martens had not worked at KY 102.

The KYYS brand enjoyed a distinctive identity in the Kansas City radio market that was built over the course of more than thirty years, during the twenty-plus years that the station operated as KY 102 and the ten-plus years that the station operated as 99.7-KY.  Moreover, because both KY 102 and 99.7 KY were "personality-driven" stations (as opposed to music-driven stations), plaintiffs did not merely introduce songs or read prepared lines between songs.

2

The station's on-air personalities, including plaintiffs, were charged with creating a connection with their listeners. Indeed, the station's listeners identified the station by its on-air personalities as much as (if not more so) by the music played on the station. As the "face" of 99.7-KY, plaintiffs conducted remote broadcasts at client's locations, appeared at and hosted concert events and made other special public appearances through which listeners came to perceive the on-air personalities and the KYYS brand as inextricably linked.

In the last several years leading up to January 2008, the Arbitron ratings for KYYS declined significantly.[2] As KYYS ratings declined, its revenue declined as well. From 2000 to 2007, KYYS's revenue dropped from $7 million to $2.6 million. In 2007 alone, the station's revenue dropped by nearly 30 percent to the point where the cost of operating the station exceeded the revenue it generated. By October 2007, Entercom executives realized that they needed to devise a "game changing" plan for KYYS to improve ratings or to devise an entirely new radio station. Ultimately, Entercom management personnel responsible for 99.7-KY determined that they could not find a way to substantially improve the performance of the station while retaining the "essence" of the KYYS brand.

In mid-November 2007, Entercom executives began to focus their efforts on flipping the format of 99.7-KY from a classic rock station to a new type of station, which they tentatively called "the Boulevard." Early plans for The Boulevard envisioned a station quite different from

---

[2]Radio station ratings are released four times each year in books published by the Arbitron Ratings Company. These books are considered the most definitive source of a radio station's ratings and contain information reflecting the quality and quantity of a station's listening audience.

99.7-KY in many ways, including a change in the station's core artists, a dramatic expansion of the size of the station's play list, a more dynamic play list, the elimination of service elements such as news and weather, and a reduction in both the number of on-air personalities employed and the role played by those on-air personalities such that the new station's image and identity would focus more heavily on the music played.

To ensure that the new station would be perceived and received by the listening public as a new station as opposed to a remake of the failing KYYS brand, Entercom executives determined that they needed to make a "clean break" from KYYS in all respects and that continuing with any elements of the KYYS brand, including its on-air personalities, would compromise the success of the new station. From mid-November 2007 through January 10, 2008, Entercom executives prepared to execute the format change and to launch The Boulevard. Preparations included choosing the songs that would make up the station's play list, creating a new logo, arranging for new call letters with the FCC, developing sales and marketing materials, the creation of a new website and searching for new on-air talent.

On January 10, 2008, Entercom flipped the formats on the 99.7 frequency, ending the KYYS brand and launching The Boulevard. Entercom marked the launch of the new station by playing 5000 songs in a row without commercial interruptions, a process that required nearly two weeks to complete at a loss of $80,000 in commercial revenue. In any event, on January 10, 2008, Entercom terminated the employment of all seven KYYS on-air personalities, including

plaintiffs.[3] Entercom advised these individuals that the decision to terminate their employment relationships was made in connection with the decision to discontinue KYYS and launch The Boulevard. Critically, plaintiffs do not dispute that the decision to discharge all seven on-air personalities, including plaintiffs, was based on the collective belief of Entercom executives that retaining on-air personalities who were so closely identified with the KYYS brand would compromise Entercom's ability to establish, position and sell The Boulevard as a truly new and different radio station.

On January 10, 2008, the date that plaintiffs were discharged, Entercom offered both plaintiffs an "enhanced" severance package in exchange for plaintiffs' execution of a release of claims agreement. Plaintiffs declined the offer and notified Entercom of their intent to seek legal counsel and pursue any available claims against Entercom. Over the next few weeks, the parties apparently had periodic communications in which Entercom reiterated its desire to have plaintiffs execute release of claims agreements in exchange for enhanced severance benefits. Plaintiffs continued to decline Entercom's offer. Ultimately, on February 22, 2008, Entercom sent letters to both plaintiffs reflecting the payment of severance otherwise owed to them (Mr. Adams was entitled to severance under a collective bargaining agreement and Ms. Martens was apparently entitled to severance under Entercom's general severance policy) and reiterating that the January 10, 2008 offer of "enhanced severance" would remain open for several days. Neither plaintiff ever executed a release of claims and Entercom never paid either plaintiff any

---

[3]At the time of her discharge, Ms. Martens was on medical leave.

additional severance.

Additional facts will be related, as necessary, in connection with the court's analysis of defendant's motion and plaintiff's particular claims.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or

her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.    ADEA Retaliation Claims

Plaintiffs contend that Entercom, after plaintiffs retained counsel and threatened legal action, retaliated against them in violation of the ADEA in two respects: by circumventing plaintiffs' counsel and mailing settlement offers directly to plaintiffs and by conditioning receipt of severance benefits otherwise due on plaintiffs' execution of a release of claims agreement. Entercom moves for summary judgment on these claims on numerous independent grounds, including that plaintiffs have waived their ADEA retaliation claims by failing to include those claims in the pretrial order; that plaintiffs failed to administratively exhaust their ADEA retaliation claims; that plaintiffs have come forward with no evidence that they suffered any "materially adverse action"; and that the requisite "causal connection" between any protected activity and materially adverse action cannot exist because Entercom first conditioned the receipt

7

of severance benefits on plaintiffs' release of claims long before plaintiffs engaged in any protected activity. As will be explained, the court concludes that summary judgment is appropriate on these claims in favor of Entercom.

A.     *Waiver of Retaliation Claims*

The court begins with Entercom's argument that plaintiffs have waived their ADEA retaliation claims by failing to include those claims in the pretrial order–an argument to which plaintiffs have responded by filing a motion to amend the pretrial order. Indeed, the parties do not dispute that there are no claims for retaliation under the ADEA set forth in the pretrial order. As articulated in the pretrial order, plaintiffs' retaliation claims are expressly brought under Title VII. Entercom, then, moved for summary judgment on these claims for the obvious reason that plaintiffs never engaged in any activity protected by Title VII. Plaintiffs' protected activity involved the assertion of their rights under the ADEA. In response, then, plaintiffs contend that they never intended to assert claims under Title VII and that Entercom, in drafting all portions of the pretrial order, including plaintiffs' claims, inaccurately identified plaintiffs' retaliation claims as arising under Title VII–a mistake that plaintiffs did not recognize until the filing of Entercom's motion for summary judgment. In its defense, Entercom highlights that plaintiffs' complaint expressly sets forth plaintiffs' retaliation claims as arising under Title VII by specific reference to the statutory provision and that plaintiffs had ample opportunity to participate in the drafting and editing of the pretrial order but did not challenge the description of plaintiffs' retaliation claims.

The court finds no prejudice in permitting an amendment of the pretrial order to reflect that plaintiffs' retaliation claims arise under the ADEA as opposed to Title VII.  Significantly, the fact that plaintiffs intended all along to assert their retaliation claims under the ADEA can come as no real surprise to Entercom, despite plaintiffs' presumably inadvertent reference to Title VII in their complaint.  Plaintiffs' charges of discrimination quite clearly articulate their retaliation claims as arising under the ADEA and the charges are void of any discriminatory acts or protected activity concerning Title VII.  Plaintiffs' complaint, in the introductory paragraph, describes their retaliation claims as arising not under Title VII but under the ADEA and while the specific counts alleging retaliation reference "42 U.S.C. 2000e-3(a)," the Title VII provision prohibiting retaliation, those counts also incorporate by reference the immediately preceding counts of discrimination under the ADEA, suggesting a relationship between discrimination under the ADEA and plaintiffs' retaliation claims.  Except for the stray reference to the Title VII anti-retaliation provision, the complaint contains no references to Title VII or any classes protected by Title VII.  Finally, Entercom does not suggest that they would have conducted discovery differently had they realized that plaintiffs intended to assert claims under the ADEA as opposed to Title VII.

That having been said, the court nonetheless finds that the specific retaliation claims articulated by plaintiffs in their summary judgment briefing have been waived.  In their briefing, plaintiffs assert that Entercom retaliated against them by circumventing plaintiffs' counsel and mailing settlement offers directly to plaintiffs and by conditioning receipt of severance benefits on plaintiffs' execution of a release of claims agreement.  Plaintiffs, however, did not articulate

9

this theory or, more specifically, did not identify these allegedly adverse actions in the pretrial order, which describes, and impliedly limits, plaintiffs' retaliation claims as follows:

> Plaintiffs . . . contend Entercom unlawfully retaliated against them in that Entercom offered to reduce or waive the terms of Plaintiffs non-competition agreements in exchange for releasing Plaintiffs' claims.

While the court realizes that plaintiffs' counsel did not draft the pretrial order, plaintiffs' counsel is of course responsible for ensuring that the claims of his clients are adequately presented and preserved and it is undisputed that counsel had ample opportunity to review the pretrial order prior to submission to the court.

Perhaps most significantly, there is nothing in the record suggesting that plaintiffs, during the course of discovery, intended to pursue retaliation claims based on Entercom's withholding of severance benefits (or circumventing plaintiffs' counsel) or that Entercom actually knew through the discovery process that plaintiffs' retaliation claims encompassed Entercom's withholding of severance benefits (or circumventing plaintiffs' counsel). While plaintiffs urge in their motion to amend the pretrial order that Entercom clearly had knowledge that they intended to assert retaliation claims under the ADEA as opposed to Title VII, they do not address their withholding-of-benefits theory or their circumventing-counsel theory in any respect.

In plaintiffs' court-authorized surreply,[4] they suggest that Entercom cannot claim surprise

---

[4]The court permitted the filing of a surreply because many of Entercom's grounds for summary judgment on plaintiffs' retaliation claims necessarily were articulated for the first time in Entercom's reply brief once it was put on notice that plaintiffs' retaliation claims concerned Entercom's withholding of benefits rather than its offer to release plaintiffs from their non-compete agreements.

because Entercom's statement of facts contains references to post-termination conduct, including references to severance pay and Entercom's desire to have Mr. Adams release his claims. But these facts are limited to evidence relevant to the court's analysis of Mr. Adams' breach of contract claim. Tellingly, Entercom's motion does not reference any evidence concerning potential severance benefits owed to Ms. Martens, who withdrew her breach of contract claim prior to the filing of Entercom's motion for summary judgment. To be sure, then, Entercom's summary judgment motion belies the suggestion that Entercom realized Ms. Martens' retaliation claim concerned the withholding of severance benefits. And Entercom's summary judgment motion does not speak to other matters relevant to an analysis of Mr. Adams' withholding-of-benefits claim, including the substance and scope of post-termination negotiations concerning severance pay (and, more specifically, any distinction drawn by the parties between severance due under the collective bargaining agreement and any "enhanced" severance package) and the release of claims. Finally, Entercom's motion for summary judgment does not reference in any respect plaintiffs' claim that Entercom improperly circumvented plaintiffs' counsel during severance negotiations.

Plaintiffs, then, have not persuaded the court that Entercom had knowledge of the specific theory now articulated by plaintiffs and they do not speak to any of the other factors relevant to

In authorizing plaintiffs' surreply, the court expressly advised plaintiffs to limit their surreply to address "only those arguments raised by defendant . . . on pages 13 through 30 of defendant's reply brief." Plaintiffs' surreply exceeds the scope of the court's order by including an "Introduction" portion in which plaintiffs accuse Entercom and its counsel of unsavory litigation and settlement tactics. Entercom has filed a motion to strike this portion of plaintiffs' surreply and, because the Introduction to the surreply clearly exceeds the scope of the court's order, the motion is granted.

the court's determination of whether to permit amendment at this late stage. Plaintiffs, then, have not met their burden of demonstrating the manifest injustice required for modifying the pretrial order. *Koch v. Koch Indus.*, Inc., 203 F.3d 1202, 1222 (10th Cir. 2000). Based on the record before it, the court can conclude only that plaintiffs impermissibly waited "until the last minute to . . . refine the theories on which they intend[ed] to build their case." *See Green Country Food Mkt., Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1279 (10th Cir. 2004).


B.      *Exhaustion of Administrative Remedies*

Entercom also contends that summary judgment is appropriate (or, more accurately in this context, dismissal of plaintiffs' claims for lack of subject matter jurisdiction) because plaintiffs have not exhausted their administrative remedies with respect to the particular theories now espoused by plaintiffs under the ADEA. Of course, because the court has concluded that plaintiffs have waived these claims, the court need not address Entercom's alternative arguments in support of its motion. Nonetheless, in an abundance of caution, the court addresses Entercom's remaining arguments.

In support of its argument that plaintiffs failed to exhaust their administrative remedies, Entercom contends that plaintiffs, in their administrative charges filed with the EEOC, did not allege that Entercom had unlawfully withheld benefits from plaintiffs and did not reference in any respect Entercom's decision to contact plaintiffs directly during severance negotiations rather than through plaintiffs' counsel. Indeed, it is undisputed that plaintiffs' charges of discrimination are devoid of any reference whatsoever to the issue of severance pay or

12

circumventing plaintiffs' counsel. Rather, plaintiffs' charges clearly base plaintiffs' retaliation claims solely on Entercom's promise to release plaintiffs from their non-compete agreements in exchange for plaintiffs' execution of a release of claims agreement and its decision to enforce those non-compete agreements once plaintiffs refused to execute release of claims agreements. Because plaintiffs did not reference anywhere in their administrative charges the retaliatory acts allegedly taken by Entercom–the withholding of benefits otherwise due and the circumvention of plaintiffs' counsel–the court would dismiss these claims for lack of subject matter jurisdiction even if plaintiffs had not waived the claims by failing to include them in the pretrial order. *Jones v. UPS, Inc*., 502 F.3d 1176, 1186 (10th Cir. 2007) (each discrete incident of alleged retaliation constitutes its own "unlawful employment practice" for which administrative remedies must be exhausted).

In an attempt to avoid dismissal of their withholding-of-benefits claims, plaintiffs, for the first time in their surreply, insist that the pertinent retaliatory act is not Entercom's withholding of benefits, but rather Entercom's effort to require plaintiffs to execute a release of claims. According to plaintiffs, then, they have adequately exhausted their administrative remedies with respect to such claims because it is undisputed that their charges reference Entercom's efforts to entice plaintiffs to execute releases. This particular construction of plaintiffs' retaliation claims would save the claims from both dismissal for lack of subject matter jurisdiction (because language concerning the release of claims is contained in the charge) and summary judgment based on plaintiffs' waiver of the claims (because language concerning the release of claims is contained in the pretrial order). Nonetheless, as will be explained, summary judgment would

nonetheless be appropriate because Entercom's "effort" to require plaintiffs to execute releases is neither a materially adverse action for purposes of the ADEA nor causally connected to plaintiffs' protected activity.[5]

## C.    *Merits of Retaliation Claims*

To reiterate, plaintiffs have waived the retaliation claims asserted by them in response to Entercom's motion for summary judgment–specifically, that Entercom retaliated against them by circumventing plaintiffs' counsel and mailing settlement offers directly to plaintiffs and by conditioning receipt of severance benefits otherwise due on plaintiffs' execution of a release of claims agreement. Those claims would also be subject to dismissal for lack of subject matter jurisdiction because they were never the subject of an administrative charge. But even ignoring plaintiffs' waiver and the exhaustion issue, the court would grant Entercom's motion for summary judgment on the merits of plaintiffs' retaliation claims. Moreover, to the extent plaintiffs in their surreply have recharacterized their claims to focus only on Entercom's "effort" to require plaintiffs to execute a release of claims agreement, the court grants summary judgment in favor of Entercom on the merits of those claims.

To establish a prima facie claim under the ADEA for retaliation, a plaintiff must establish three elements: (1) he or she engaged in protected opposition to discrimination; (2) a reasonable

---

[5]Moreover, dismissal would still be appropriate on plaintiffs' retaliation claims based on Entercom's decision to contact plaintiffs directly during severance negotiations–claims that plaintiffs do not discuss in their surreply.

employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008) (citation omitted). In support of its motion for summary judgment, Entercom contends that plaintiffs cannot establish the second or third elements necessary for their prima facie case.

1.    Materially Adverse Action

According to Entercom, summary judgment is appropriate on the merits of plaintiffs' ADEA retaliation claims because no reasonable jury could conclude that plaintiffs suffered any materially adverse action. An employer's actions are "materially adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)). "[W]hile the standard is sensitive to the particular circumstances of each case, it prescribes an objective inquiry that does not turn on a plaintiff's personal feelings about those circumstances." *Id*. (citing *Burlington Northern*, 548 U.S. at 68-69). Each case is "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id*. (quoting *Burlington Northern*, 548 U.S. at 71).

The court begins with plaintiffs' claims that Entercom refused to provide severance benefits to plaintiffs unless they released their claims. Mr. Adams contends that he was entitled to severance benefits under the collective bargaining agreement, his individual employment

contract and Entercom's standard severance policy as outlined in the employee handbook. Ms. Martens contends that she was entitled to severance benefits under Entercom's standard severance policy as reflected in the employee handbook. Both plaintiffs contend that Entercom's decision to withhold severance benefits is materially adverse because an employer's decision to withhold benefits might well dissuade a reasonable employee from filing a charge of discrimination. Entercom contends that no materially adverse action was taken because there is no evidence that Entercom withheld benefits to which plaintiffs were otherwise entitled; rather, Entercom simply offered an enhanced severance package in exchange for a release of claims.

The court begins with Mr. Adams' claim. It is undisputed by Mr. Adams that Entercom, shortly after terminating Mr. Adams' employment, paid him all severance that he was due under the relevant provision of the collective bargaining agreement. The only additional potential sources of severance pay available to Mr. Adams, then, are his individual employment contract and Entercom's standard severance policy as outlined in its employee handbook. Both of these sources, however, expressly condition the payment of severance on the execution of a release of claims. The pertinent provision of Mr. Adams' employment agreement states as follows:

> [T]he Company may, at any time, terminate this Agreement for the convenience of the Company, provided Company pays Employee a sum equal to three (3) months of the Employee's then current salary in exchange for which Employee shall sign a Release of Claims Agreement that will be prepared by the Corporate Human Resources Director in a form acceptable to the Company.

Indeed, Mr. Adams testified in his deposition that this provision of his employment agreement meant that "[i]f I did not sign the release, I was not going to receive the three months' salary."

Similarly, Entercom's general severance policy, as outlined in its employee handbook, also states that for those employees with three or more years of service (like Mr. Adams), Entercom will pay such employee one week of severance pay for each full year of service up to a maximum of 15 weeks "after a Release of Claims Agreement is signed and effective."[6]  Mr. Adams readily admits that he did not execute a release of claims and, in the absence of the release, nothing in the record reflects that he was otherwise entitled to severance benefits beyond what he had already received under the collective bargaining agreement.

In his surreply, Mr. Adams suggests that a jury could conclude that Entercom was withholding severance benefits "otherwise due" because, at the time Entercom was trying to convince Mr. Adams to release his claims, it was unclear to Mr. Adams whether Entercom was withholding only "enhanced" severance under his individual employment contract or whether Entercom was also withholding the severance that he was undisputedly owed under the collective bargaining agreement.  As explained in connection with the court's conclusion that Mr. Adams has waived his retaliation claim, the evidence in the record concerning the parties' post-termination negotiations is sparse.

What is in the record, however, is a letter from Entercom to Mr. Adams dated February 22, 2008 in which Entercom forwards a check to Mr. Adams for the amount of severance he is

---

[6]There is an additional problem with Mr. Adams' reliance on the severance policy contained in Entercom's employee handbook.  The severance policy in the handbook expressly states that the policy "does not apply to Employees who are covered by a collective bargaining agreement where severance pay was the subject of negotiations between the union and the Company."  It is undisputed that Mr. Adams's employment relationship with Entercom was covered by a collective bargaining agreement that included the provision of severance pay.

owed under the collective bargaining agreement and reiterates that the "January 10 offer of enhanced severance" will remain open for several more days. The letter reflects that Entercom was forwarding the severance check at that time because Mr. Adams, in declining to sign the release, had foreclosed the opportunity for "enhanced" severance such that Entercom was able to calculate the amount of severance owed as of that date. In that regard, the letter explains to Mr. Adams that the offer of enhanced severance will remain open for several days and, if he decided to accept the offer, then Entercom would pay Mr. Adams "the differential between the January 10 offer and the enclosed amount."

Mr. Adams is unable to direct the court to any evidence in the record suggesting that Entercom's January 10, 2008 offer or any of its subsequent reiterations of that offer related to anything other than "enhanced" severance. Moreover, the record is devoid of any evidence demonstrating that Entercom's payment of severance under the collective bargaining agreement was unreasonably delayed or that Entercom otherwise was attempting to condition the payment of severance due under the collective bargaining agreement on Mr. Adams' execution of a release of claims agreement. It bears repeating, too, that Mr. Adams does not dispute that he received all severance owed to him under the collective bargaining agreement and that he received such severance in the absence of an executed release of claims. In such circumstances, no reasonable jury could conclude that Entercom's conduct with respect to the payment of severance under the collective bargaining agreement could well dissuade a reasonable worker from making or supporting a charge of discrimination.

In the end, then, Mr. Adams raises no genuine issues of fact concerning whether

Entercom withheld benefits "otherwise due" Mr. Adams. Analyzing retaliation claims with similar facts, other courts have granted summary judgment on those claims in the absence of a materially adverse action. For example, in *Jackson v. Lyons Falls Pulp & Paper, Inc*., the plaintiff alleged that his former employer retaliated against him by refusing to provide severance pay after he filed a charge of discrimination with the EEOC. 865 F. Supp. 87, 95 (N.D.N.Y. 1994). Rejecting the claim, the district court explained:

> Plaintiff's contention that defendant retaliated against him by refusing to grant benefits and severance pay also fails in light of the evidence. Under the Separation Agreement, plaintiff would receive severance payments and benefits in return for his signature. Because plaintiff was not otherwise entitled to receive severance pay and benefits, the award of severance pay and benefits was a privilege rather than a right. As such, defendant's refusal to supply plaintiff with severance pay and benefits can not be characterized as an adverse action. Instead, defendant merely declined to enlarge plaintiff's rights to compensation. Such a decision does not form the basis of a retaliation claim.

*Id.* (citations omitted). Similarly, in *Cronin v. ITT Corp*., the plaintiff alleged that his employer's refusal to pay him additional severance was motivated by the plaintiff's refusal to sign a release of claims agreement. 737 F. Supp. 224, 231 (S.D.N.Y. 1990). The district court granted summary judgment on the claim, explaining:

> [T]here is no indication on the record before me that Cronin's denial of a special award in the amount of three month's pay was retaliatory. Cronin did not fulfill the conditions necessary for him to become eligible to receive the award. As part of both the Voluntary and Involuntary Separation Plan, departing employees were offered an option to elect a cash award in addition to their notice and severance pay by signing a Separation Agreement that contained a release clause. Cronin admitted that the special award was separate and apart from the severance pay to which he was entitled, and that he was paid his full severance pay. Cronin did not receive the special award simply because he did not sign the Separation Agreement.

*Id.* Here, it is undisputed that Mr. Adams received all severance to which he was entitled under the collective bargaining agreement and that any additional severance was due to Mr. Adams only upon the execution of a release of claims–a condition that Mr. Adams undisputedly did not fulfill. Under these circumstances, no reasonable jury could conclude that Mr. Adams suffered a materially adverse employment action when Entercom failed to pay additional severance in the absence of an executed release. Summary judgment is granted in favor of Entercom on this claim. *EEOC v. SunDance Rehabilitation Corp.*, 466 F.3d 490, 502 (6th Cir. 2006) (declining to pay severance not otherwise due when an employee refuses to sign a waiver or release does not amount to an adverse employment action) (collecting cases).[7]

Ms. Martens' claim fares no better. Ms. Martens alleges that Entercom withheld severance benefits "otherwise due" under Entercom's general severance policy as outlined in its employee handbook. She does not contend that she was owed severance by virtue of an individual employment agreement or the collective bargaining agreement.[8] The handbook

_____

[7]To be clear, the court is not suggesting that an employer's refusal to provide enhanced severance can never constitute an adverse employment action. Indeed, in certain circumstances not present here, courts have held that a refusal to provide additional severance is sufficient to constitute an adverse action. *See Magnan v. Manhattan Eye, Ear & Throat Hosp.*, 2002 WL 334505, at *4 (S.D.N.Y. Feb. 28, 2002) (in discrimination context, refusal to provide severance package to which plaintiff was not otherwise entitled sufficient to constitute adverse employment action where employer provided package to similarly situated employees outside the protected class); *Paquin v. Federal National Mortgage Ass'n*, 119 F.3d 23, 32 (D.C. Cir. 1997) (complete withdrawal of enhanced severance offer after protected activity sufficient to constitute adverse action).

[8]The pretrial order expressly states that it is "uncontroverted" that Ms. Martens was covered by the collective bargaining agreement. Nonetheless, in her surreply, Ms. Martens insists (without evidentiary support) that she was not covered by the agreement. Because Ms. Martens apparently believes that her exclusive reliance on the employee handbook is

provides that employees with more than one year but less than three years of service (like Ms. Martens) are entitled to two weeks of severance pay. The evidence in the record–specifically, Entercom's February 22, 2008 letter to Ms. Martens–reflects that Ms. Martens received the equivalent of two weeks of severance pay. Ms. Martens does not dispute that she received that amount. To the extent she asserts that she was owed more than two weeks of severance pay under Entercom's general severance policy, the handbook expressly states that "[s]everance pay exceeding two weeks of pay requires the employee to sign a Release of Claims Agreement that will be prepared by the Vice President of Human Resources." It is undisputed that Ms. Martens never fulfilled this condition. Thus, any additional severance owed to Ms. Martens, either under the policy or Entercom's January 10, 2008 offer of enhanced severance, was undisputedly conditioned on the execution of a release of claims. Because Ms. Martens did not execute the release, she was not otherwise entitled to additional severance. For these reasons and the reasons explained in more detail in connection with Mr. Adams' claim, no reasonable jury could conclude that Ms. Martens suffered a materially adverse action when Entercom refused to provide additional severance benefits to Ms. Martens.

The court turns then to plaintiffs' claims that Enterom circumvented plaintiffs' counsel and mailed settlement offers directly to plaintiffs–a fact that Entercom does not dispute. The record reflects that Entercom's Vice President, Dave Alpert, mailed letters to Mr. Adams and Ms. Martens on February 22, 2008 in which he explains that he has learned from plaintiffs'

---

beneficial to her, the court will assume that she was not covered by the collective bargaining agreement.

counsel that plaintiffs have declined Entercom's January 10, 2008 offer to provide "enhanced severance" and in which he reiterates the offer and states that the offer will remain open for several days. Significantly, the letters are entirely professional. Nothing on the face of the letters could reasonably be deemed to be hostile, threatening, intimidating or harassing. There is no evidence that plaintiffs felt uncomfortable that Mr. Alpert contacted them directly by mail instead of contacting their counsel. There is no evidence that Mr. Alpert's contact with plaintiffs interfered with plaintiffs' relationship with their counsel in any way. In such circumstances, no reasonable jury could conclude that Entercom's actions might well dissuade a reasonable worker from pursuing a charge of discrimination. *See O'Dell v. Trans World Entertainment Corp.*, 153 F. Supp. 2d 378, 395 (S.D.N.Y. 2001) (employer's refusal to communicate with plaintiff's counsel does not constitute prohibited retaliatory act). Summary judgment, then, would be appropriate with respect to plaintiff's retaliation claim based on Entercom circumventing plaintiffs' counsel and mailing settlement offers directly to plaintiffs even if that claim were not already subject to summary judgment based on waiver and subject to dismissal for failure to exhaust administrative remedies.

Finally, the court addresses plaintiffs' theory, as set forth in their surreply, that Entercom's retaliatory act is not the withholding of benefits but its effort to have plaintiffs execute releases. The evidence before the court demonstrates only that Entercom offered enhanced benefits in exchange for a release of claims. There is no evidence that Entercom in any manner attempted to coerce or otherwise pressure plaintiffs into executing the releases. And the record is devoid of any evidence suggesting that plaintiffs suffered any harm whatsoever

when they refused to sign the releases (other than foreclosing the opportunity for enhanced benefits to which they were not otherwise entitled). In such circumstances, Entercom's mere "efforts" to have plaintiffs execute releases cannot be deemed a materially adverse action. There is simply nothing in the record that would permit a jury to conclude that Entercom's "efforts" might dissuade a reasonable person from making or supporting a charge of discrimination.

2.    Causal Connection

If plaintiffs' retaliation claims based on Entercom's withholding-of-benefits or Entercom's effort to have plaintiffs execute releases had survived Entercom's motion to this point, then the court nonetheless would have granted summary judgment in favor of Entercom because plaintiffs cannot establish the requisite causal connection between any protected activity and Entercom's offer concerning the provision of severance benefits in exchange for a release of claims or Entercom's efforts to have plaintiffs execute releases.

Significantly, both the general severance policy contained in Entercom's employee handbook and Mr. Adams' individual employment agreement expressly condition the receipt of additional severance benefits on the execution of a release of claims. Entercom's efforts to have plaintiffs release their claims, then, began long before plaintiffs engaged in any protected activity. Consistent with the express provisions of these documents, it is undisputed that Entercom, on the day of plaintiffs' terminations, offered plaintiffs additional severance in exchange for a release of claims. This offer, then, occurred prior to plaintiffs having the opportunity to engage in any protected activity. The fact that Entercom reiterated the offer to

plaintiffs at some point after plaintiffs had retained counsel and threatened to file lawsuits cannot be deemed retaliatory when the offer was entirely consistent with those offers made before plaintiffs engaged in protected activity and was entirely consistent with Entercom's normal severance policy and the specific provisions of Mr. Adams' employment contract. *See Fraiberg v. 4Kids Entertainment, Inc.*, 2008 WL 821820, at * (S.D.N.Y. Mar. 26, 2008) (granting Rule 12(b)(6) motion to dismiss retaliation claim where employer offered severance pay in exchange for execution of waiver of claims prior to protected activity and reiterated offer after plaintiff engaged in protected activity; "[i]t is logically impossible that the imposition of the General Release requirement was motivated by retaliatory animus since the condition was announced prior to the alleged protected activity."); *see also Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997) (affirming grant of summary judgment on retaliation claim where employee received disciplinary warnings both before and after protected activity; "additional warnings . . . simply completed the disciplinary process already set in motion" prior to protected activity).

Moreover, plaintiffs have come forward with no evidence that Entercom declined to pay enhanced severance to plaintiffs because of their protected activity rather than simply because they refused to execute releases. There is no evidence that Entercom, in any internal communications or communications with plaintiffs, ever referenced plaintiffs' protected activities or related those activities in any way to its refusal to pay additional severance benefits to plaintiffs. There is no evidence that Entercom paid enhanced severance benefits to other employees who refused to sign a release but had not engaged in protected activity. For this reason, too, plaintiffs cannot establish causation. *Sundance Rehabilitation Corp.*, 466 F.3d at

502-03 (in retaliation context, no causation established where the record contained no evidence that employer declined to pay severance because of protected activity rather than because employee failed to execute release agreement).

Because plaintiffs have come forward with no evidence suggesting a causal connection between their protected activity and Entercom's severance offer or its efforts to have plaintiffs execute a release of claims, summary judgment is appropriate.

## IV.    FMLA Interference Claim

Plaintiff Traci Martens contends that Entercom interfered with her rights under the FMLA by terminating her employment during her medical leave.[9] To establish her FMLA interference claim, Ms. Martens must demonstrate that she was entitled to FMLA leave; that some adverse action by Entercom interfered with her right to take FMLA leave; and that Entercom's action was related to the exercise of her FMLA rights. *See DeFreitas v. Horizon Inv. Management Corp.*, 577 F.3d 1151, 1159 (10th Cir. 2009) (quotations omitted). Once plaintiff has established a prima facie case, Entercom can defend the claim "by showing that the dismissal would have

---

[9]In the pretrial order, Ms. Martens' FMLA claim is characterized as a retaliation claim rather than an interference claim. Thus, Entercom contends that any FMLA interference claim has been waived and Ms. Martens, in turn, seeks to amend the pretrial order to include an FMLA interference claim and to delete any reference to an FMLA retaliation claim. Entercom, however, candidly admits in response to the motion to amend the pretrial order that discovery on Ms. Martens' FMLA claim would have been the same regardless of whether the claim was articulated as an interference claim or a retaliation claim. Entercom also admits that the substance of Entercom's arguments on summary judgment concerning an FMLA retaliation claim would not have been altered significantly for purposes of Ms. Martens' FMLA interference claim. The court, then, grants Ms. Martens' motion to amend the pretrial order in this respect.

occurred regardless of the employee's request for or taking of FMLA leave." *Id.* at 1159-60 (citing 29 C.F.R. § 825.216(a)(1) (Department of Labor FMLA regulation stating that when an employee is laid off during FMLA leave, "[a]n employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration")). Entercom does not dispute that Ms. Martens has satisfied the elements required to establish her FMLA interference claim. Indeed, it is undisputed that Ms. Martens was entitled to leave and that her employment was terminated during her leave. Certainly, because the termination occurred during Ms. Martens' leave, the timing of the termination indicates a causal connection between her FMLA leave and her discharge. *See id.* at 1160. Thus, Ms. Martens' FMLA interference claim turns only on whether Entercom can establish that it would have terminated Ms. Martens regardless of whether she took FMLA leave.

Reviewing the record as a whole, the court concludes that Entercom has met its burden of proof and that no genuine issue of material fact exists with respect to its reasons for terminating Ms. Martens' employment. *Campbell v. Gambro Healthcare, Inc*., 478 F.3d 1282, 1289 (10th Cir. 2007) (affirming grant of summary judgment in favor of employer on FMLA interference claim where no genuine issues of fact existed concerning whether employer would have fired employee regardless of leave). Ample undisputed evidence demonstrates that Entercom decided to terminated Ms. Martens' employment–and the employment of all other on-air personalities, none of whom was on medical leave–as a result of its decision to flip the format of KYYS and launch The Boulevard. It is not disputed by Ms. Martens that she, as an on-air personality with 99.7-KY, was closely identified by the listening audience with KYYS. She

does not dispute that KYYS's ratings and revenues had declined dramatically in the years leading up to the format change. She does not challenge Entercom's decision to flip the format of KYYS nor its desire to make a "clean break" from KYYS. Significantly, Ms. Martens fails to controvert that the decision to discharge all seven on-air personalities, including Ms. Martens, was based on the collective belief of Entercom executives that retaining on-air personalities who were so closely identified with the KYYS brand would compromise Entercom's ability to establish, position and sell The Boulevard as a truly new and different radio station. Finally, she does not dispute that The Boulevard, in all significant respects, was perceived by the listening public as an entirely new radio station and entirely distinct from KYYS.

Despite the fact that she fails to controvert the significant evidence demonstrating that Entercom terminated Ms. Martens' employment in connection with its decision to terminate the KYYS brand and launch The Boulevard, Ms. Martens attempts to argue that the "format change" was simply an excuse for Entercom to terminate Ms. Martens' employment in violation of the FMLA. According to Ms. Martens, the "format change" was simply not that dramatic, as evidenced by the "extensive overlap of artists" between the play lists of 99.7-KY and The Boulevard. Ms. Martens' argument, however, is not persuasive for several reasons. First, she does not contend that the format change was superficial to the point that Entercom could have retained the on-air personalities of KYYS without compromising the success of The Boulevard. In fact, while she highlights that certain artists appear on the play lists of both KYYS and The Boulevard, Ms. Martens does not explain how this overlap suggests that Entercom would not have terminated her employment but for her FMLA leave. And, in light of the undisputed facts

that Entercom terminated six other on-air personalities on the same day–none of whom was on FMLA leave at the time–the overlap in artists does nothing to undercut Entercom's evidence concerning the termination decision.

Moreover, Entercom readily admits that there exists some overlap of artists on the play lists of the two stations. According to Entercom's evidence, the overlap exists because The Boulevard retained some classic rock elements and there are simply certain artists that any "classic rock" station must maintain on its play list. The mere overlap in certain artists, however, is where any similarity between the stations ends. For it is undisputed that The Boulevard played "deep album" songs[10] that 99.7-KY did not play (even though 99.7-KY may have played other songs by the same artist) and that The Boulevard played a greater number of songs by artists on its play list (even though 99.7-KY may have played a handful of songs by the same artist).[11] All told, The Boulevard's play list was more than double the length of 99.7-KY's play list and contained many, many artists not found on the play list of 99.7-KY.

In any event, Entercom's evidence demonstrates that Entercom's decision to make a "clean break" from KYYS (including terminating all of its on-air talent) was made in large part

---

[10]According to Wikipedia, a deep album song or "cut" is a song which commercial radio stations rarely broadcast. The phrase comes from the fact "that on vinyl albums, the hit singles promoted by record companies are usually found early on in the record, with the other, lesser-known songs buried 'deep' into the record."

[11]By way of example, the play lists of both The Boulevard and 99.7-KY contains songs from the Beatles. But while 99.7-KY's play list contained only four songs from the Beatles (all of which are well-known), The Boulevard's play list contains 21 songs from the Beatles, none of which were played by 99.7-KY and many of which are lesser known Beatles' songs.

because The Boulevard retained some classic rock elements, including a resulting overlap in artists. Specifically, Entercom recognized that the overlap in artists–in the absence of an otherwise clean break from KYYS, including the termination of on-air talent–might result in market confusion and compromise the success of the station. In other words, because Entercom needed the listening audience to perceive The Boulevard as an entirely new and different station from KYYS despite some overlap in artists, Entercom determined that any other overlap with the KYYS–from on-air talent to call letters–would need to be eliminated.

Ms. Martens directs the court to no other evidence suggesting that the format change was not significant and makes no other arguments that Entercom's evidence that it would have terminated Ms. Martens' employment regardless of her leave is somehow unworthy of belief. In light of the overwhelming undisputed evidence concerning Entercom's decision to flip station formats and its undisputed belief that it needed a clean break from KYYS to successfully launch its new radio station, the mere overlap in certain artists simply does not cast doubt on Entercom's stated reasons for firing Ms. Martens. Because there are no genuine issues of fact concerning whether Entercom would have terminated Ms. Martens' employment regardless of her FMLA leave, summary judgment in favor of Entercom is appropriate on Ms. Martens' FMLA interference claim.

## V.     Breach of Contract Claim

Finally, plaintiff Brian Adams alleges a claim for breach of contract under Kansas common law. Specifically, Mr. Adams contends that Entercom breached paragraph 9.b. of Mr.

Adams' individual employment agreement "by failing to pay the proper severance in accordance with the terms of [his employment agreement] because any severance payable under Section 9(b) should have been in addition to, or 'stacked' with, severance" to which he was entitled and received under the collective bargaining agreement. Entercom moves for summary judgment on this claim on the grounds that the claim is preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and, in any event, Mr. Adams cannot establish that Entercom breached Mr. Adams' employment agreement in any respect. As will be explained, the court concludes that Mr. Adams' claim is preempted by § 301 and, thus, dismisses the claim. The court declines to address, in the alternative, the merits of Mr. Adams' claim.

Preemption involves competing state and federal interests. *Mowry v. United Parcel Serv.*, 415 F.3d 1149, 1152 (10th Cir. 2005). Section 301(a) of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

*Id.* (quoting 29 U.S.C. § 185(a)). The Supreme Court has held that § 301 authorizes federal courts "to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Id.* (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985)). As a result, "[a] state rule that purports to define the meaning or scope of a term in a contract suit therefore is pre-empted by federal labor law." *Id.* (quoting *Allis-Chalmers*, 471 U.S. at 210).

The Supreme Court has made it clear, however, that "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is

pre-empted by § 301 or other provisions of the federal labor law." *Id*. (quoting *Allis-Chalmers*, 471 U.S. at 211). Indeed, preemption arises only when an evaluation of the claim "is inextricably intertwined with consideration of the terms of the labor contract." *Id*. (quoting *Allis-Chalmers*, 471 U.S. at 213). The court, then, must determine whether Mr. Adams' breach of contract claim is inextricably intertwined with existing provisions of the collective bargaining agreement. *See id.* As will be explained, the court determines that Mr. Adams' claim is inextricably intertwined with provisions of the collective bargaining agreement such that his claim is preempted by § 301 of the LMRA.

Mr. Adams' breach of contract claim stems from one sentence in paragraph 9.b. of his employment contract. Paragraph 9.b. concerns, among other things, the provision of severance pay and the specific sentence relied upon by Mr. Adams states:

> [Any severance] payment made pursuant to this Section 9.b shall be in lieu of and in satisfaction of all claims for severance, payment in lieu of notice or other compensation which may otherwise arise upon termination of employment with the Company, except for salary or other compensation earned through the date of termination and payment of earned but unused vacation in accordance with Company policy then in existence.

In support of his breach of contract claim, Mr. Adams contends that the severance that he was owed under the collective bargaining agreement constitutes "salary or other compensation earned through the date of termination" such that any severance payments made to him under paragraph 9.b. would not be "in lieu of" severance paid to him under the collective bargaining agreement. Mr. Adams, then, contends that he was entitled to severance under both his employment contract and the collective bargaining agreement and that Entercom breached his contract by failing to

pay him severance under his individual contract.[12]

To begin, the language of Mr. Adams' employment contract conflicts with the language of the collective bargaining agreement. While Mr. Adams' individual employment contract states that any severance paid under the individual contract is "in lieu of and in satisfaction of all claims for severance," the collective bargaining agreement clearly restricts Entercom's rights regarding separate agreements concerning severance. Specifically, section 3.04 of Article III of the collective bargaining agreement provides as follows:

> The Station shall have the right to enter into individual contracts with any Artist, provided however, the rate of pay payable to all such Artists is higher than the rate of pay he/she would be entitled to under this Agreement and that all such Artists receive all other terms and conditions, including, but not limited to, sick pay, insurance benefits, pension benefits, holiday and vacation entitlement, severance pay and overtime pay, as due them under this Agreement.

Pursuant to this section, Entercom is not permitted through a separate contract to restrict in any manner the payment of severance due an employee under the collective bargaining agreement. Courts have consistently held that section 301 preempts any individual employment contract that is inconsistent with a collective bargaining agreement. *See J.I. Case Co. v. NLRB*, 321 U.S. 332, 339 (1944) (an employee is permitted to make an individual contract provided "it is not inconsistent with a collective agreement"); *Galvan v. Hyatt Regency San Francisco Airport*, 1998 WL 865280, at *2 (N.D. Cal. Dec. 7, 1998); *McKiernan v. Smith-Edwards-Dunlap Co.*,

_____

[12]Although he admits that he did not sign the release as required for payment of severance in paragraph 9.b., Mr. Adams contends that no duty to sign the release arose because Entercom never presented the severance payment to Mr. Adams in the first instance. In other words, Mr. Adams contends that Entercom breached the agreement by failing to perform. Because the court concludes that Mr. Adams' claim is preempted in any event, the court declines to reach the merits of Mr. Adams' claim.

1995 WL 311393, at *4 (E.D. Pa. May 17, 1995) ("Employees who are members of the bargaining unti cannot negotiate individual contracts . . . that are inconsistent with the collective bargaining agreement."); *Raptopolous v. WS, Inc*., 738 F. Supp. 394, 396 (D. Or. 1990) ("Section 301 of the Labor Management Relations Act preempts disputes involving an individual labor contract claimed to be inconsistent with a collective bargaining agreement in order to assure uniform federal interpretation of collective bargaining agreements.").[13]

In a related vein, preemption is also mandated because it is the collective bargaining agreement that authorizes the right of Entercom to enter into individual contracts with its employees and, thus, it is the collective bargaining agreement that defines the scope of Entercom's authority in entering into individual agreements. The court, then, would need to interpret section 3.04 of Article III of the collective bargaining agreement to determine whether the individual contract Mr. Adams seeks to enforce exceeds the scope of those agreements authorized by the collective bargaining agreement. *Steinbach v. Dillon Cos*., 253 F.3d 538, 542-43 (10th Cir. 2001) (where collective bargaining agreement authorized employer to develop policies that formed basis of plaintiff's claim, claim was preempted because claim required court to analyze whether employer exceeded authority under policies and collective bargaining agreement defined scope of employer's authority); *Garley v. Sandia Corp*., 236 F.3d 1200, 1210-

---

[13]The facts indicate that Mr. Adams' individual employment contract pre-dates Mr. Adams' membership in the union. While a pre-existing individual contract is not inevitably subsumed into or eliminated by a subsequent collective bargaining agreement, a subsequent collective bargaining agreement will supersede a pre-existing individual contract when the state law contract claim requires, as here, an analysis of the relationship between the individual contract and the collective bargaining agreement. *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 395-96 (1987).

11 (10th Cir. 2001) (where documents that formed the basis of employee's breach of contract claim were intended to be read in harmony with the collective bargaining agreement, the documents are "inextricably intertwined with consideration of the terms of the labor contract, requiring preemption).

In addition to the reasons stated above, the court concludes that the claim is preempted for yet another reason. Mr. Adams' specific argument with respect to his breach of contract claim–that severance owed under the collective bargaining agreement constitutes not a "claim for severance" but "salary or other compensation earned through the date of termination"–is substantially dependent on an interpretation of the severance provisions of the collective bargaining agreement. *Mowry v. United Parcel Serv.*, 415 F.3d 1149, 1157 (10th Cir. 2005) (employee's claim that employer "shorted" his wages is preempted by § 301 because the claim necessarily requires an analysis of the wage and compensation provisions of the collective bargaining agreement). Thus, because Mr. Adams' breach of contract claim requires the interpretation of the severance provisions of the collective bargaining agreement, the claim is preempted.

For each of the foregoing reasons, the court is drawn to the inevitable conclusion that whether Entercom breached Mr. Adam's individual employment contract is inextricably intertwined with the collective bargaining agreement such that the claim is preempted. When a party's state law claim is preempted by section 301, the court must either treat that claim as a section 301 claim or dismiss the claim as preempted by federal labor-contract law. *Allis-*

*Chalmers Corp. v. Lueck*, 471 U.S. 202, 220-21 (1985). In this case, the court is unable to treat Mr. Adams' claim as a section 301 claim because Mr. Adams has not demonstrated or alleged that he has exhausted the contractual remedies provided in the collective bargaining agreement. *Id.* (where plaintiff failed to make use of the grievance procedure established in collective bargaining agreement, court was required to either dismiss claim for failure to exhaust contractual remedies or dismiss claim as preempted by section 301); *Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1463, 1471 (10th Cir. 1993). The court, then, dismisses Mr. Adams' breach of contract claim as preempted by section 301.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc.44) is **granted**; plaintiffs' motion to amend the pretrial order (doc. 54) is **granted in part and denied in part**; and defendant's motion to strike (doc. 59) portions of plaintiffs' surreply is **granted** and the court **strikes** the "Introduction" portion of plaintiffs' surreply.

**IT IS SO ORDERED.**

Dated this 30th day of October, 2009, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

35